DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of - | ) |
| | ) |
| Philips Lighting North American | ) ASBCA Nos. 61769, 61873, 62391 |
| Corporation | ) |
| | ) |
| Under Contract No.    CQ-12077 | ) |

APPEARANCES FOR THE APPELLANT:     Franklin C. Turner, Esq.
                                   Ethan Brown, Esq.
                                   Cara A. Wulf, Esq.
                                   Alexander W. Major, Esq.
                                   Matthew Wright, Esq.
                                     McCarter & English, LLP
                                     Washington, DC

APPEARANCES FOR THE AUTHORITY:     Jeffrey Weinstein, Esq.
                                     Chief Counsel
                                     Washington Metropolitan Area
                                       Transit Authority
                                     Washington, DC

                                   Tracye Winfrey Howard Esq.
                                   George E. Petel, Esq.
                                     Wiley Rein LLP
                                     Washington, DC

OPINION BY ADMINISTRATIVE JUDGE WOODROW

This appeal involves a contract to upgrade and replace the lighting systems at 25 parking garages owned by the Washington Metro Area Transit Authority (WMATA).  Conformed Contract No. CQ-12077, Parking Garage Lighting Efficiency (the contract), required Philips Lighting North American Corporation (Philips) to upgrade and replace the lighting fixtures with energy-efficient LED technologies and install state-of-the art electricity metering equipment in all of WMATA's parking garages.

The contract established two phases of performance:  the construction phase, during which Philips agreed to design and install the upgraded lighting and metering systems at each garage; followed by the maintenance phase, during which Philips would maintain the system for a period of 10 years.  The contract required WMATA to pay Philips in 20 semi-annual installments over the ten-year maintenance phase based

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

on the energy savings achieved from the project. The contract did not require payment during the construction phase.

Philips contends that WMATA breached the contract by failing to pay Philips' invoices for installment payments and also breached the duty of good faith and fair dealing by causing delays during the construction phase of the contract. On July 30, 2020, we granted partial summary judgment to Philips as to the payment obligations but denied summary judgment as to Philips' allegations of the breach of the duty of good faith and fair dealing. *Philips Lighting North American Corp.*, ASBCA No. 61769 *et al.*, 20-1 BCA ¶ 37,679 at 182,929.

On September 3, 2020, WMATA filed a motion for reconsideration requesting that the Board reconsider two aspects of its opinion: (1) the Board's grant of partial summary judgment under Count II of Philips' complaint with respect to the payment provision in the Lighting Contract, and (2) the Board's grant of Philips' motion to strike WMATA's affirmative defense of setoff associated with Philips' alleged performance delay. In addition to opposing WMATA's motion, Philips filed a motion requesting that we order WMATA to make immediate payment under the Lighting Contract and that we impose sanctions against WMATA for the alleged bad faith in its motion. On March 11, 2021, we denied both parties' motions. *Philips Lighting North American Corp.*, ASBCA No. 61769 *et al.*, 21-1 BCA ¶ 37,821 at 183,652-53.

Starting on March 22, 2021, we held a seven-day hearing to determine quantum and to resolve Philips' allegations of bad faith and the breach of the duty of good faith and fair dealing. Due to the ongoing COVID-19 pandemic, we conducted the hearing virtually.

Philips contends that WMATA's breaches entitle Philips to be excused from further performance and to be compensated at the full value of the contract (app. br. at 45). Philips advances several alternative theories of breach, including bad faith, breaches of the duty of good faith and fair dealing, and material breach based upon nonpayment (app. br. at 10-20). Philips also contends that the Board could view WMATA's conduct as a *de facto* default termination and judicially impose a termination for convenience remedy (app. br. at 22-24).

In response, WMATA argues that the testimony does not support a finding of either bad faith or a breach of the duty of good faith and fair dealing (resp't br. at 24-30). WMATA further argues that it was justified in refusing to pay Philips' invoices, because the invoices demonstrated that Philips never met the energy savings guarantee using the baseline measurement specified by the contract (resp't br. at 25-29). With respect to Philips' theory that WMATA's conduct amounts to a *de facto* default termination, WMATA contends that the contract is ongoing and has not

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

been terminated and that the Board does not possess jurisdiction to order the WMATA contracting officer to issue a termination (resp't reply br. at 27-28).

As we explain below, we hold that WMATA's non-payment constitutes a material breach of the lighting contract. Because Philips continues to maintain the lighting system pursuant to the contract and has not elected to cease performance, we award damages based on Philips past performance through February 29, 2024, the last date for which we have complete information. If Philips continues performance going forward, WMATA must pay any future invoices pursuant to the terms of the contract and consistent with this decision.

We further hold that WMATA did not act in bad faith or breach the implied duty of good faith and fair dealing when it refused to pay Philips' invoices. We also hold that Philips is entitled to additional damages for infrastructure repairs, but that Philips has not met its burden of demonstrating that it is entitled to additional damages for the cost of installing additional meters. Finally, we hold that Philips is not entitled to payment for energy savings accrued during the enlarged installation period.

FINDINGS OF FACT

**I. The Solicitation and Philips' Proposal**

1. On October 31, 2011, WMATA issued a request for proposal (RFP) to obtain a lighting system at its parking garages to produce "total cost and energy savings." (App. supp R4, tab 3 at 3[1] answer at ¶ 6)

2. The purpose of the lighting project was to, among other things, improve lighting for customer comfort and safety and reduce WMATA's energy consumption and operating costs (R4, tab 1 at 113).

3. The RFP – which later was incorporated into the Contract – provided that the costs for the project would be financed through operating cost savings (R4, tab 1 at 18; answer at ¶¶ 7, 18).

4. Philips had an opportunity to tour and photograph the garages before bidding (tr. 2/119; 5/200).

---

[1] The bates-labeling contained in the both the government's Rule 4 file and appellant's supplemental Rule 4 file has leading zeros and the prefixes. We have removed the prefixes and leading zeros from our citations for clarity.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

5. Paragraph 13 of the RFP stated that it was Philips' responsibility to understand the conditions of the garages and the extent of work required (ex. G-84 at 87; R4, tab 1 at 87; tr. 2/202).

6. On August 15, 2013, Philips submitted its proposal to WMATA (ex. G-5 - 12). In its proposal, Philips agreed to "finance 100 percent of all Project costs" and required no upfront capital outlay from WMATA. (Ex. G-6 at 13313).

7. Philips' proposal also included "Philips Energy Guarantee," which Philips provided WMATA with its energy consumption calculations as part of its proposal, the final version of which was dated August 30, 2013 (app. supp. R4, tab 492 at 8715-18). The RFP describes the "Philips Energy Guarantee" as follows:

> The vendor will provide a guarantee that, over the life of the Project, the annual energy costs (the difference between baseline energy cost and energy cost after the implementation of the Project) will be equal to or less than the Project's annual cost to the Authority. The Authority's Installment Payments to the Vendor shall begin after final completion of the last of the 25 garages and after the guaranteed energy savings are verified through the measurement and verification plan. "Final Completion" shall mean that that the system installation is completed, tested, programmed, and providing required lighting levels with the guaranteed savings per the agreement and that WMATA has accepted the lighting system as installed.

8. In its proposal, Philips estimated WMATA's maximum potential energy consumption to be 22,992,704.88 kilowatt hours (kWh) per year (answer at ¶ 33; app. supp. R4, tab 492 at 8721).

9. Philips based this estimate on a survey of the total number and type of light fixtures in the garages multiplied by each fixture's energy consumption (app. supp. R4, tab 492 at 8717-18). Philips based its calculations on certain assumptions: first, that all interior garage lights, stairwell and lobby fixtures, and exterior fixtures would operate 24 hours per day, seven days per week, for the entire year; and that 10 percent of these fixtures would be burned out or otherwise non-operational during the baseline measurement period (ex. G-44, 129; tr. 1/193-96).

10. Using its pre-bid estimate, Philips proposed that its system, once installed, would use only 7,376,876.45 kWh annually, providing WMATA with an expected annual kWh energy savings of 15,615,828.43 kWh per year – an annual proposed

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

reduction of 67.92 percent. Philips' expected annual energy savings were incorporated into the contract. (R4, tab 1 at 5-6; answer at ¶ 34)

## II. The Contract

11. WMATA and Philips entered into the contract on October 18, 2013 (R4, tab 1 at 2; answer at ¶ 37).

12. The contract provides that the Armed Services Board of Contract Appeals (ASBCA or Board) is "the authorized representative of the Board of Directors for final decisions on an appeal" taken from a decision of a Contracting Officer on a dispute "concerning a question of fact arising under or relating to the Contract." (R4, tab 1 at 63).

13. The contract incorporates various pieces of WMATA correspondence and related documentation, including five (5) non-consecutive pages of Philips' proposal, eight (8) pages of insurance certification paperwork, its own request for proposal, the Department of Labor Wage Rates (DC130002 08/23/2013), and fifteen (15) pages of Amendments (R4, tab 1 at 1-196).

14. The contract includes a "PRICE SCHEDULE SHEET" that incorporates both Table 1 and Table 1A from Philips' proposal. Philips submitted this table in response to the solicitation and it is incorporated into the contract. Note that the "Guaranteed Energy Savings (kWh)" and "estimated kWh hours" are power figures, not dollar figures. (R4, tab 1 at 5-6)

15. Functionally, the Contract was divided into two phases: a construction phase, during which Philips would install the lighting system, and a maintenance phase, during which Philips would maintain that system for a period of ten years (answer at ¶¶ 43-45). The construction phase required the installation of all lighting solutions within 730 calendar days from the date of contract award, setting the original completion date for the construction phase of the contract as October 18, 2015, as identified in the contract at part II, § 2 at ¶ 2(a) (R4, tab 1 at 84; answer at ¶ 76). The contract provided that Philips would not receive installment payments during the construction phase. After completion of the construction phase, Philips was to be paid by WMATA in twenty semi-annual installments over the ten-year maintenance phase of the contract, from the savings achieved from the project under the contract at Part II, § 2 at ¶ 6(a). (R4, tab 1 at 84-85; answer at ¶ 21)

16. Table 1A of the contract sets forth a schedule for WMATA to pay Philips "twenty (20) semi-annual installments to be made over the ten (10) year maintenance portion of the Contract (the installment payments) from the savings achieved by the Project." (R4, tab 1 at 87). The installment payments identified in the Price Schedule

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

Sheet, totaling $16,487,486, anticipated that Philips' new garage lighting system would reduce WMATA's energy demand in these parking structures by approximately two-thirds, resulting in a "guaranteed energy savings" of 15,615,828 kWh per year. The price schedule sheet further provided an "estimated kWh used" of 7,376,876 kWh in each operational year. (R4, tab 1 at 5-6; answer at ¶ 41).

17. In addition to the twenty semi-annual payments, the parties also agreed that at the end of the ten-year Maintenance Phase, WMATA would have an end of term purchase option to acquire all lighting system assets in the twenty-five garages for a sum of $3,713,665. The combined sum of the purchase option and installment payments equal a total proposed project cost of $20,201,151. (R4, tab 1 at 5)

18. The new lighting system involved the replacement of approximately 16,300 lights, including 1000 pole head lights, 13,000 garage ceiling lights, and a variety of other stairwell lights, utility room lights, flood lights, step lights, down lights, exit signs, and wall sconces (tr. 1/231-33).

19. Most of the pole head lights and garage ceiling lights for the new lighting system included a Limelight sensor, which is part of a wireless mesh network and control system that includes motion and light sensing technology. This system allows the lighting system to react to occupancy levels by illuminating only those parts of the garage that are necessary for the safety of the garage users at any particular time. (Tr. 1/115) The Limelight system also allowed for centralized control of the lighting system such that the lights could be selectively dimmed or turned off (thereby using less energy) while still meeting overall illumination requirements (tr. 1/238). For example, if part of a garage was sufficiently illuminated by daylight, the lights in that portion of that garage could be turned off. This feature is known as "daylight harvesting." *Id*.

### A. Measurement of Energy Consumption

20. The contract established terms and conditions pertaining to the measurement of baseline and actual energy costs, as well as the calculation of energy savings (R4, tab 1 at 108-09, 121).

21. With respect to the measurement and calculation of baseline and actual energy costs, the Contract states:

> BASELINE AND ACTUAL ENERGY COSTS
>
> a. Baseline energy consumptions shall be established by directly measuring the power consumption for the current lighting system at each garage for a minimum period of six

6

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

weeks before installation of the new lighting system. The measurement shall be accomplished by installing utility grade meters on all electrical circuits/panels not currently connected to dedicated meters. The contractor shall submit a plan for installing the meters within 45 days of notice to proceed.

b. The utility grade meters shall remain in place and maintained for the life of this contract in order to measure actual energy consumption for the new lighting system.

c. The energy cost shall be computed by multiplying price per Kwh paid by WMATA during the period by energy consumption for the period.

d. Actual Project/energy savings shall be computed by multiplying the difference between the measured actual energy consumption and the baseline energy consumption by the price per KWh paid [by] WMATA during the period.

(R4, tab 1 at 109-10)

22. The contract required the contractor to "provide a detailed contract period energy monitoring and verification plan. The measurement and verification plan shall be in accordance with the International Performance Measurement and Verification Protocol, Volume 1, 2012." (R4, tab 1 at 121)

23. The RFP and contract are silent on whether the baseline should be adjusted to account for outages (tr. 2/37-40).

**B. Payment Terms**

24. The contract provides for semi-annual installment payments to be paid over the maintenance period. Paragraph 6 of the contract, Payment Terms, provides in relevant part:

> a. The Project costs will be paid in 20 semi-annual installments over the 10-year maintenance period (the "Installments Payments") from the savings achieved from the Project, to the extent the savings from the Project are equal to or higher than the Installment Payments. *If the Project savings are less than the scheduled Installment*

7

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

*payments, then the scheduled Installment payment(s) for that period are deemed amended to equal the actual Project savings obtained (the "Amended Installment Payments").* The difference between the Amended Installment Payments and the scheduled Installment Payments shall be non-recourse to Metro.

b.  Installment Payments to the Vendor shall begin after final completion of the last of the 25 garages and after the guaranteed energy savings are verified through the measurement and verification plan.  "Final Completion" shall mean that that the system installation is completed, tested, programmed, and providing required lighting levels with the guaranteed savings per the agreement and that WMATA has accepted the lighting system as installed.

(R4, tab 1 at 84-85 (emphasis added))

25.  WMATA is required to pay Philips after receipt of a properly completed invoice under the contract at Part II, § 2 at ¶ 7(a).  A "properly completed invoice" is one that is accompanied by the measurement and verification report verifying the actual savings obtained during the temporal period to which the invoice relates under the contract at Part II, § 2 at ¶ 7.  (R4, tab 1 at 85; answer at ¶ 142)

26.  Paragraph 7, Billing and Payment, provides in relevant part:

a.  Payment will be made after receipt of a properly completed invoice. . . .

b.  Invoices shall be supported by the measurement and verification report verifying the actual savings and shall contain the following information:  date, contract and order number (if any), item numbers, description of supplies or services, sizes, quantities, unit prices, and extended totals. Final invoices must clearly be marked "FINAL" and cite the amount of the contract, amount previously paid, and the balance due.

(R4, tab 1 at 85)

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

27.  The contract requires WMATA to pay Philips within 30 days of receipt of a properly prepared invoice, less any deductions provided in the contract.  Paragraph 30, Payments, provides that:

> The Authority shall pay the Contractor, normally within 30 days of receipt of a properly prepared invoice or voucher, the prices stipulated in this contract for supplies delivered and accepted or services rendered and accepted, less any deductions provided in this contract.

(R4, tab 1 at 72; answer at ¶ 98)

## C.  Infrastructure Repairs

28.  Paragraph 43 of the contract provides that WMATA shall pay, at its discretion, the cost of repairing defects in the existing lighting electrical distribution system.  Specifically, paragraph 43 states:

> The contractor shall identify details of all defects in the existing lighting electrical distribution system including wiring, conduits and other components in the first design submittal.  The submittal shall also include itemized cost of repairing the defects.  At the Authority's sole discretion, identified defects in the system[s] will be repaired with WMATA forces OR the contractor shall be directed to perform and repair of the defects in accordance with the unit price schedules.  This corrective action will have no recourse for the contractor to submit delay or extended associated costs.  Payment per the unit price schedule is inclusive of all associated costs.

(R4, tab 1 at 108)

## D.  Risk of Construction Delays

29.  Paragraph 13 of the contract places the responsibility on the contractor to ascertain the risk of any delays in the installation of the lighting system on the contractor.

> 13.  CONDITIONS AFFECTING THE WORK
>
> The Contractor shall be responsible for having taken steps reasonably necessary to ascertain the nature and extent of

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

the work, and the general and local conditions which can affect the work or the cost thereof.  Any failure by the Contractor to do so will not relieve the Contractor from responsibility for successfully performing work without additional expense to the Authority.  The Authority assumes no responsibility for any understanding or representations concerning conditions made by any of its officers or agents prior to the execution of this Contract, unless such understanding or representations are expressly stated in the Contract.

(R4, tab 1 at 87)

## III.  Contract Performance

30.  On October 18, 2013, WMATA issued the Notice to Proceed to Philips (R4, tab 1 at 2; resp't opp'n to app. mot. for partial summary judgment at 7)

### A.  Measurement of Baseline Energy Consumption at Each Garage

31.  Philips performed circuit tracing on the electrical circuits in each garage, took a comprehensive inventory of the light fixtures in each garage, installed power meters, and took real-time measurements of the energy consumed by the existing lighting system in each garage (app. supp. R4, tabs 477 at 11-15; 481 at 26-30; tr. 1/239-40).

32.  On April 16, 2014, after installing power meters and measuring the energy consumption for six weeks, Philips provided its measurement and verification (M&V) plan to WMATA (app. supp. R4, tab 46, 46a at 352-71).  Philips' M&V plan provided that "[e]ach garage's existing controls (photocells and time clocks) will be identified and any adjustments to normalize for seasonality will be investigated and recommendations will be reviewed between Philips and WMATA."  (App. supp. R4, tab 46a at 358)  Philips' M&V plan did not contain any explicit discussion of outages or how to adjust the baseline measurement to account for burned out or missing fixtures, other than stating that the annual report will note "significant problems such as burned out fixtures and deviations with the expected number of operating fixtures, etc."  (App. supp. R4, tab 46a)

33.  Philips submitted (M&V) reports pursuant to the contract for each parking garage.  Philips submitted its first M&V report (for the Huntington North garage) on August 5, 2014 (ex. A-68; tr. 2/7, 196).  Philips recorded six-week (or more) baseline measurements, extrapolated to an entire year for purposes of the Contract payment provisions in "Section 3, Annual Baseline Energy Consumption," in the M&V reports

10

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

it submitted to WMATA. (*See*, *e.g.*, ex. G-148) The total directly measured power consumption of all of the garages was 19,186,521 kWh per year (tr. 2/172; R4, tab 29 (using half the 19.1 million as the 6-month baseline)).

34. Mr. Gregory Jones is a project manager for construction projects at Philips and was the project manager for the WMATA project since the contract was signed in October 2013 (tr 1/215; 225-26). He personally was involved in all aspects of the project, beginning with the initial identification of circuits for the interior garage lighting, the installation of meters on the relevant circuits, the negotiation of subcontractor agreements (tr. 1/213, 215-21, 226). Mr. Jones was the Philips employee responsible for preparing the M&V reports (tr. 2/7). He was not involved in the pricing proposal or technical proposal phase of the contract (tr. 12/225-26). The M&V reports described in detail the steps Philips took to survey, meter, and develop the baseline level of energy consumption for each garage. The steps included: (1) conducting fixture counts and circuit surveys; (2) having WMATA employee escorts turn off individual circuit breakers in order to identify the electrical circuits powering each fixture; (3) installing meters on each of the relevant circuits in order to measure the actual energy consumption of the lights on that circuit; (4) performing independent verification of the measurements by performing spot measurements of power draw; and (5) comparing spot measurements, measured power draw, and calculations based upon fixture counts to develop an accurate baseline measurement for each garage. (Ex. A-68 at 2; tr. 2/7-21)

35. The initial M&V report for Huntington North, one of the first garages for which an M&V report was prepared, included a light measurement survey to determine the baseline illumination levels of the existing garage lights (ex. A-68 at 22743). The contract required Philips to provide a certified professional that had been trained in how to lay out and measure the illumination levels of existing lighting systems (tr. 2/27). The contract further specified that the new lighting system meet specific illumination standards, measured in foot candles at points three feet above the ground (tr. 2/28). However, Philips's baseline surveys demonstrated that the existing lights sometimes did not meet this standard, as was the case in the Huntington North garage (ex. A-68 at 22743; tr. 2/27-30). However, at WMATA's request, these surveys were not included in any of the subsequent M&V reports for the other garages (tr. 2/28).

36. WMATA rejected Philips' initial M&V report because of defects in the survey method (Greg Jones decl. at ¶ 17). However, after Philips refined its methodology, WMATA told Mr. Gregory Jones that it was comfortable with Philips' M&V methodology and would accept measurements that were within 5 percent of the calculated amount (tr. 2/20-22).

11

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

37. Each M&V report contained a detailed comparison of the calculated energy consumption based upon fixture counts and the actual energy consumption as measured by the installed meters (*see*, *e.g.*, ex. A-68 at 22740-41; tr. 2/27). In most garages, the calculated energy consumption was greater than the actual measured energy consumption (*see*, *e.g.*, ex A-68 at 22741; tr. 2/27). This discrepancy was due to missing or burned-out fixtures that were included in the calculated baseline, but were not included in the measured baseline because they did not draw power and were not measured by the installed meters. For example, there was an 8.2 percent difference between the calculated energy usage and the measured energy usage in the Huntington North garage. (Tr. 2/24) However, when missing or burned-out fixtures are accounted for in the calculated energy usage, the discrepancy is reduced to only 0.3 percent (tr. 2/23-27). *Id*. Therefore, if the missing or burned-out lights were replaced, the energy usage for the entire garage would go up by roughly 8 percent (tr. 2/24). Mr. Jones described the process by which he reconciled the calculated and measured wattage on a fixture-by-fixture basis using field surveys (tr. 2/20, 26-27). Philips generated multiple versions of each M&V report in an effort to adequately support, from an engineering standpoint, that it had captured an accurate baseline measurement (tr. 2/20-21).

38. For certain garages, at WMATA's request, Philips adjusted the baseline estimates of annual consumption due to changes in daylight on a seasonal basis. For example, in some garages, the lights are controlled with photocells that automatically switch the lights on or off based on the amount of ambient daylight reaching the photocell (tr. 2/31). Mr. Jones testified that these adjustments were necessary only for three garages (tr. 2/31).

39. In its answers to interrogatories, WMATA claimed that it made "every effort" to bring all light fixtures in a garage into a working order before the baseline measurement began for that garage (tr. 2/43; ex. A-522, WMATA's second supplemental objections and responses to appellant's first set of interrogatories at interrogatory no. 11). Gregory Jones disagreed, stating that in his opinion, WMATA did not make every effort (tr. 2/44).

40. Exhibit 22 describes steps involved in metering, but these steps were changed in Amendment 11 to the RFP (R4, tab 1 at 196). However, none of the amendments to the RFP addressed adjusting the baseline to account for outages (tr. 2/198-99).

## B. Delays During the Construction Phase

41. In late 2016 and early 2017, Philips' electrical subcontractors, Lamb Group Electric (Lamb) and Lighting Maintenance, Inc. (LMI), performed a variety of repairs to the electrical infrastructure of the parking garages. Lamb and LMI documented

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

these repairs in change orders submitted to WMATA. (Ex. A-533 at 30-31, Kaplowitz Dec'l at 1-2, ex. A). The repairs included troubleshooting circuity and replacing faulty wire, circuitry, and conduit. In total, these repairs amounted to $88,333. (Ex. A-533 at 72, Schedule 5; tr. 4/70)

42. On March 16, 2016, WMATA issued Modification No. 0001, extending the construction phase by 319 days, until August 31, 2016 (app. supp. R4, tabs 312, 312a at 4667; answer at ¶ 77). The modification included a two-page memorandum setting forth a variety of delays attributable to WMATA, including reviewing and approving proposed replacement light pole designs for top deck light pole replacement, in the amount of time necessary for WMATA to replace the grounding system for lighting at the Shady Grove South garage, and in the time necessary to process security clearances for the contractor's electricians and in (ex A-260; tr. 2/85-86). For its part, Philips expended considerable time finding and hiring electricians who could meet WMATA's security clearance standards (tr. 2/85-86).

43. During the construction phase, WMATA provided electrician escorts for Philips' electrical subcontractors. The primary purpose of the electrician escorts was to ensure the safety of Philips' electrical subcontractors when working on the garage lighting systems (tr. 7/132-34). Pursuant to the contract, WMATA was obligated to make its escorts available for "a maximum of 8 consecutive [hours] at each work location" (R4, tab 1 at 107-08). The record demonstrates that WMATA dedicated five to six full-time escorts to the project (tr. 7/133).

44. Philips did not fully staff the contract during the installation phase (tr. 5/218). Instead of having two full crews of 12 working at two different garages simultaneously, Philips worked at only one garage at a time during much of the installation period (tr. 7/144-45). The record also demonstrates that there were delays associated with the need to replace Philips' original subcontractor for the metering installation (tr. 7/137-41), as well as delays in obtaining the metering equipment (tr. 7/142).

45. Philips completed the construction phase of the contract on or before February 1, 2017 (resp't. reply br. at 16).

## IV. Invoices for Payment

46. On August 21, 2017, Philips submitted its initial invoice in the amount of $1,024,444 for the first six-month period of the maintenance phase from February 1, 2017 through July 31, 2017 (R4, tab 29 at 378). As the cover letter transmitting this invoice set forth, the invoice utilized the original baseline of 19,186,521.3 kWh for its calculation of energy savings, explaining that the invoice included "substantial concessions on our part with respect to . . . entirely reasonable equitable adjustments

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

that should have been made to the pre-retrofit baseline energy consumption of the garages based on the substantial number of non-operating fixtures." (R4, tab 29 at 375, 380). Moreover, the invoice capped the savings incurred during the construction phase at $597,732 and used February 1, 2017, as the completion date for the construction phase (R4, tab 29 at 376).

47. On May 2, 2018, Philips submitted invoices for the first three of the semi-annual installment payments to be paid over the ten-year maintenance phase (R4, tab 31). The invoices calculated energy consumption based upon a modified baseline, increasing the original baseline of 19,186,521.3 kWh to 20,791,478.1 kWh (R4, tab 31 at 397). Philips stated that "[a]djustments to the baseline were made to account for documented fixture and circuit outages during the pre-install metering period. Outages were specifically identified for each garage in the Site Specific Measurement and Verification [M&V] Reports provided to WMATA prior to installation of lights." (R4, tab 31 at 397: *see also* tr. 2/171-72). Each of the invoices included a M&V report ("WMATA Parking Garage Lighting Retrofit Energy Savings Report"), which provided WMATA with a six-month savings summary and chart illustrating the energy savings during each of the respective invoices' six-month period (R4, tab 31).

48. On May 2, 2018, Philips submitted Invoice WMATA-1 requesting a total payment of $1,355,608.89, which included the amount due for equipment and services for the semi-annual period from September 1, 2016 to February 28, 2017. The invoice requested a "parking garage lighting efficiency payment" of $725,578 less an "energy savings guarantee shortfall" of $13,155.10. Invoice WMATA-1 also included a request for $643,185.99, which purportedly represents one-half of the total savings realized by WMATA during the construction phase (9/14/2014 to 8/31/2016). (R4, tab 31 at 388)

49. Invoice WMATA-2, also dated May 2, 2018, requested payment of $1,368,763.99, which included the amount due for equipment and services for the semi-annual period from March 1, 2017 to August 31, 2017 ($725,578), plus $643,185.99, which purportedly represents the second half of the total savings realized by WMATA during the construction phase (R4, tab 31 at 398).

50. Invoice WMATA-3, also dated May 2, 2018, requested payment of $740,089.50 for equipment and services for the semi-annual period from September 1, 2017 to February 28, 2018 (R4, tab 31 at 408).

51. On October 16, 2018, Philips submitted invoice WMATA-4 in the amount of $740,089.50 covering the period from March 1, 2018 to August 31, 2018 (R4, tab 495 at 8944). The invoice included the M&V savings report, the 2018 light level certification, and an explanation that the light level certification for the Southern

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

Avenue garage could not be completed due to repairs being made by WMATA (app. supp. R4, tab 495 at 8948; tr. 2/162, 171-75).

52. WMATA has not paid any of the invoices that Philips has submitted (answer at ¶ 158).

## V. Notice to Cure Deficiency

53. On March 23, 2018, WMATA sent Philips a notice to cure deficiency (cure notice) stating that Philips is in breach of the contract for failure to: (1) "[d]eliver the supplies or to perform the services within the time specified in the contract, herein or any extension hereof;" and (2) achieve the Guaranteed Energy Savings of 15,615,828 kWh set forth in the Price Schedule Sheet, Amendment A10 Table I. According to the cure notice, the "measured [e]nergy [c]onsumption for Year 1 ending January 31, 2018 produced an Energy Savings of only 14,729,854 kWh, which is a shortfall of 885,973 kWh of the guarantee." (App. supp. R4, tab 479)

54. On April 2, 2018, Philips submitted a response to the cure notice (app. supp. R4, tab 481 at 8385). Philips asserted, in part, that it had completed the construction phase by August 31, 2016, and that it had produced the energy savings in accordance with the contract (app supp. R4, tab 481 at 8387). Philips further contended that, to the extent there was a shortfall in energy savings for any period of time, the payment terms of the contract still entitle Philips to payment for the work performed and the energy savings achieved (*id*. at 8387). Finally, Philips contended that WMATA had breached the contract by refusing to pay any of Philips' invoices (*id*. at 8407-09).

## VI. Procedural History

### A. Certified Claims

55. On June 21, 2018, Philips filed its first certified claim in the amount of $3,464,462.38 for its first three invoices (WMATA-1, WMATA-2, and WMATA-3) for semi-annual installment payments related to each 6-month maintenance period between September 1, 2016 and February 28, 2018 (app. supp. R4, tab 482 at ¶¶ 8468-69). Invoice Nos. WMATA-1 and WMATA-2 also included invoiced amounts related to energy savings provided to WMATA during the construction phase that, according to Philips, ended on August 31, 2016 (R4, tabs 29, 31) Philips requested resolution of its claim pursuant to the Contract's Disputes Clause (answer at ¶ 288; app. supp. R4, tab 482 at ¶¶ 8468-69). WMATA did not respond to Philips' claim within 60 days (answer to second amended complaint at 48).

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

56. On September 5, 2018, Philips submitted a second certified claim summarily raising factual issues that Philips had submitted to WMATA as part of its Cure Notice Response and related correspondence (R4, tab 34 at 428; answer at ¶ 298). Specifically, Philips sought to recover $1,342,728.64 in extra-contractual costs allegedly caused by WMATA-directed changes to the contract's scope of work, as well as payment for the full contract price of $ 21,592,511 due as a result of WMATA's alleged material breach of the contract. Philips also sought lost profits of an unspecified amount on future maintenance charges provided under the contract. (R4, tab 34 at 428-29)

57. On November 1, 2018, WMATA denied Philips' second certified claim (R4, tab 35; answer at ¶ 304-05).

58. On December 6, 2019, Philips submitted its third certified claim seeking payment for three additional invoices (Invoice Nos. WMATA-4, 8913958238, and 8913967667) for semi-annual installment payments related to each 6-month maintenance period from March 1, 2018 to August 31, 2019 (ex. A-516). On January 13, 2020, WMATA denied Philips' third certified claim (ex. A-520).

## B. Appeals Before the Board

59. On August 24, 2018, Philips filed a notice of appeal with the Board based upon the deemed denial of Philips' first certified claim, dated June 21, 2018.

60. On November 11, 2018, Philips filed a second notice of appeal with the Board challenging the contracting officer's final decision regarding Philips' second claim.

61. On December 17, 2018, Philips filed its First Amended Complaint. As of the date of the First Amended Complaint, Phillips has submitted to WMATA invoices totaling $4,204,551.88, exclusive of interest (answer at ¶ 155; R4, tab 31 at 386-412; app supp. R4, tab 495 at 8942-9108).

62. On January 16, 2020, WMATA filed its Answer to Philips' First Amended Complaint. WMATA admitted that it had made no payment at all to Philips under the Contract (answer at ¶ 158).

63. On March 12, 2020, Philips filed its Second Amended Complaint, and on April 13, 2020, WMATA filed its Answer to Philips' Second Amended Complaint.

64. On February 28, 2019, Philips moved for partial summary judgment on Counts II and III of its second amended complaint. Count II alleged that WMATA breached the contract by failing to pay Philips' invoices for installment payments.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

Count III alleged a breach of the duty of good faith and fair dealing based, in part, on delays during the construction phase of the contract. Philips also moved to strike WMATA's affirmative defense seeking liquidated damages.

65. On July 30, 2020, we granted partial summary judgment as to the payment obligations in Count II, but denied summary judgment as to the alleged breach of the duty of good faith and fair dealing set forth in Count III. We further granted Philips' motion to strike WMATA's affirmative defense seeking liquidated damages, holding that the Board does not possess jurisdiction to entertain WMATA's request for liquidated damages, because WMATA's contracting officer did not issue a final decision upon the request as required by the disputes clause of the contract. *Philips Lighting North American Corp.*, ASBCA No. 61769 *et al.*, 20-1 BCA ¶ 37,679 at 182,925-29.

66. On September 3, 2020, WMATA filed a motion for reconsideration of the Board's July 30, 2020 Opinion, requesting that the Board reconsider two aspects of its opinion: (1) the Board's grant of partial summary judgment as to the payment obligations under the contract; and (2) the Board's grant of Philips' motion to strike WMATA's affirmative defense of setoff associated with Philips' alleged performance delay (resp't mot. for recon. at 1).

67. On October 5, 2020, Philips filed its opposition and concurrently moved for an order directing payment of money now due it and for the imposition of sanctions against WMATA for the alleged bad faith in its motion (app. opp'n at 1-3).

68. On March 11, 2021, we denied the motions brought by both parties. *Philips Lighting North American Corp.*, ASBCA No. 61769 *et al.*, 21-1 BCA ¶ 37,821 at 183,647. With respect to Philips' motion for an order directing payment and for the imposition of sanctions, we held that our decision granting summary judgment as to the payment obligations did not establish the quantum owed to Philips. *Id.* at 183,652.

69. On March 22, 2021, we began a seven-day virtual hearing to determine quantum for the judgment on Count II of the second amended complaint and to resolve Philips' allegations of bad faith and the breach of the duty of good faith and fair dealing.

70. On May 7, 2021, the parties filed their initial post-hearing briefs, and on May 28, 2021, they filed their post-hearing rebuttal briefs.

71. On September 22, 2023, at the Board's request, the parties each filed supplemental expert reports updating their respective damages calculations to reflect the period of time since the original expert reports filed prior to the hearing. On

17

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

March 22, 2024, the parties filed a second supplemental report updating their respective damages calculations to reflect the passage of time.

DECISION

## I. What is the Proper Measure of Damages

In our July 30, 2020 opinion, we concluded that the lighting contract expressly anticipates payments that are less than the scheduled payments. Installment payments for each period are calculated by subtracting the actual energy usage from the baseline to calculate the savings. If the savings are less than or equal to the "guaranteed energy savings" predicted in the contract, WMATA pays Phillips the amount of the savings. If, on the other hand, the savings exceed the predicted "guaranteed energy savings" amount, the "guaranteed energy savings" constitute a cap on the payment that WMATA owes Phillips. *Philips Lighting North American Corp.*, ASBCA No. 61769 *et al.*, 20-1 BCA ¶ 37,679 at 182,926-28.

During the hearing, we heard fact and expert testimony regarding the calculation of the baseline and whether Philips has met the guaranteed savings level.

### A. The Appropriate Baseline for Determining Semi-Annual Installment Payments

The parties dispute the figure to be used as the baseline for determining whether Philips has met the energy savings guarantee. WMATA contends that the appropriate figure is the measured baseline of 19,186,521 kWh, while Philips contends that the measured baseline should be adjusted to 20,791,478 kWh to account for light fixtures that were broken, burned out, or otherwise inoperable during the period when the measurements were taken (findings 37, 46).

Although the difference of 1,604,957 kWh between the measured baseline of 19,186,521 kWh and the adjusted baseline of 20,791,478 kWh may seem relatively small, it affects whether the energy savings achieved by Philips is equal to or greater than the "energy savings guarantee" set forth in Table 1 of the contract. For example, using Philips' adjusted baseline, Philips' expert witness, Ms. Linda Hsaio, calculated that Philips met the guaranteed energy savings in each six-month period of the contract since the initial period (ex. A-533 at 21-22). However, if the measured baseline of 19,186,521 kWh is used, then Philips' expert concedes that Philips achieved roughly 90 percent of the guaranteed level in each six-month period (ex. A-533 at 65[2] (Schedule 4A)).

_____

[2] The tables contained in this report do not have bates-label numbering. As such, this citation is to the PDF page number.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

According to WMATA, the failure to meet the "guaranteed" energy savings is fatal to Philips' case and relieves WMATA of any obligation to pay Philips' invoices (resp't br. at 11).  The Board has ruled that Philips need not satisfy the 15,615,828 kWh energy savings guarantee to be entitled to payment.  *Philips Lighting North American Corp.*, ASBCA No. 61769 *et al.*, 20-1 BCA ¶ 37,679 at 182,926-28, WMATA acknowledges this, but "vehemently disputes that conclusion and preserves its objection."  (resp't br. at 44).

### 1. Whether the Baseline Measurement Accounts for Missing or Burned Out Lights

In support of its adjustment of the baseline measurement, Philips contends that the contract's definition of baseline is ambiguous and should be interpreted favorably to Philips pursuant to the doctrine of *contra proferentem* (app. reply br. at 17).  If the baseline does not account for missing or burned out lights, then Philips would have to replace those fixtures for free and additionally fund the energy consumption of those replaced fixtures for the life of the contract.  According to Philips, this would be a windfall to WMATA that is not included in the parties' bargain and is contrary to the intent of the contract (app. br. at 27).

WMATA disagrees, contending that the plain language of the baseline clause is clear and unambiguous (resp't br. at 3).  To the extent there is any ambiguity, WMATA insists that it was patent and that it was incumbent upon Philips to clarify the ambiguity (resp't reply at 15).  WMATA points out that baseline measurement clause anticipates that the contractor will develop a metering plan that it would submit to WMATA prior to installation.  According to WMATA, Philips should have cleared up any ambiguities concerning how to measure the baseline electricity consumption of the existing lighting system at the time it submitted its metering plan (resp't reply at 15).

In interpreting a contract, "'clear and unambiguous [contract provisions] must be given their plain and ordinary meaning' . . . and we may not resort to extrinsic evidence to interpret them . . . ."  *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1040 (Fed. Cir. 2003) (citations omitted) (en banc).  "An ambiguity exists when a contract is susceptible to more than one reasonable interpretation."  *E.L. Hamm & Assocs., Inc. v. England*, 379 F.3d 1334, 1341 (Fed. Cir. 2004).  "To show an ambiguity it is not enough that the parties differ in their respective interpretations of a contract term.  Rather, both interpretations must fall within a 'zone of reasonableness.'"  *NVT Tech., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (citing *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 751 (Fed. Cir. 1999)).  In deciding whether an interpretation is reasonable:

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

> We must seek to put ourselves in the position of appellant at the time he bid on the contract, *i.e.*, we must seek the meaning that would be attached to the language by a reasonably intelligent bidder in the position of appellant, who would be expected to have the technical and trade knowledge of his industry and to know how to read and interpret technical engineering specifications and perform construction work in accordance with such specifications.

*Adrian L. Roberson, d/b/a Roberson Constr. Co.*, ASBCA No. 6248, 61-1 BCA ¶ 2857 at 14,915.

If, after applying the above analysis, we determine that a contract term is ambiguous, we generally read the contract against the party that drafted the contract under the doctrine of *contra proferentem*. *R.L. Persons Constr., Inc.*, ASBCA No. 60121, 18-1 BCA ¶ 37,007 at 180,236 (citing *Turner Constr. Co. v. United States*, 367 F.3d 1319, 1321 (Fed. Cir. 2004)). However, if the ambiguity is sufficiently apparent that there was a patent ambiguity, then the contractor must inquire as to the meaning of that contractual provision. *Id.* Failure to do so will lead to the ambiguity being resolved against the contractor. *Triax Pacific, Inc. v. West*, 130 F.3d 1469, 1475 (Fed. Cir. 1997). Because the doctrine has the effect of relieving the government of the consequences of its own poorly drafted contract, it is applied narrowly to those cases where the ambiguity is so patent and glaring that it is unreasonable for a contractor not to inquire about them. More subtle ambiguities are deemed latent and accorded an interpretation favorable to the contractor. *Id*.

The baseline clause states that:

> a. Baseline energy consumptions shall be established by directly measuring the power consumption for the current lighting system at each garage for a minimum period of six weeks before installation of the new lighting system. The measurement shall be accomplished by installing utility grade meters on all electrical circuits/panels not currently connected to dedicated meters. The contractor shall submit a plan for installing the meters within 45 days of notice to proceed.

> b. The utility grade meters shall remain in place and maintained for the life of this contract in order to measure actual energy consumption for the new lighting system.

20

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

    c.  The energy cost shall be computed by multiplying price per Kwh paid by WMATA during the period by energy consumption for the period.

    d.  Actual Project/energy savings shall be computed by multiplying the difference between the measured actual energy consumption and the baseline energy consumption by the price per Kwh paid [by] WMATA during the period.

(Finding 21).

We conclude that the plain language of the baseline clause is clear and unambiguous.  Philips acknowledges that a "strictly literal reading of this provision does not reference outages or how to adjust the baseline for outages observed during metering." (App. br. at 25)  However, Philips attempts to create an ambiguity by referencing the fact that both parties agreed to adjust the actual measurements for seasonality, contending that this divergence from the literal reading implies that the clause is intended to provide for adjustment (app. br. at 25-26).

We do not agree that the decision to adjust the baseline measurement to account for seasonal lighting changes means that the clause is ambiguous.  Because the clause states that direct measurements will be taken for a period of at least six weeks, it is logical to conclude that the parties would need to agree to extrapolate the measurements to produce an annual figure.  The fact that the parties did not also agree beforehand on a need to adjust for outages does not create an ambiguity.

In support of its contention that the baseline provision is ambiguous, Philips further argues that there is a tension between the baseline provision and the measurement and verification plan specified in Part III, ¶7(10) of the contract, which states that "the measurement and verification plan shall be in accordance with the International Performance Measurement and Verification Protocol, Vol. I (2012)" ("IPMV Protocol") (app. br. at 26; finding 22).  We do not see the baseline provision as being in tension with the requirement to follow the IPMV Protocol, nor do we believe that the requirement to follow the IMPV Protocol creates an ambiguity.  Rather, this provision of the contract places the burden on the contractor to prepare a measurement and verification plan that accounts for outages.  As appellant's witnesses extensively testified, the IMPV Protocol specifically addresses outages and provides detailed guidance about how to make baseline adjustments for fixture outages like those observed in the garages (tr. 6/227-38).  Thus, Philips had an opportunity to clear up any concern about outages when it submitted its measurement and verification plan for approval.  Tellingly, Philips' M&V plan did not contain any explicit discussion of

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

outages or how to adjust the baseline measurement to account for burned out or missing fixtures (finding 32).

Although each of Philips' M&V reports contained extensive documentation of the outages in each garage (finding 37), the parties did not agree in advance how to account for outages. The time to raise this issue was before metering started, not after Philips realized that its savings would not meet the projected level. Indeed, both Philips' and WMATA's experts agreed that baseline adjustments for fixture outages were considered non-routine and would require the agreement of both parties (tr. 8/208-09; 7/7-12).

Indeed, Philips applied a 10 percent outage factor in its initial proposal, demonstrating its understanding that the measured baseline would be affected by outages (finding 9). Philips' application of this outage factor further demonstrates that it understood the contract's baseline provision to be based solely upon measured energy consumption without any subsequent adjustment for observed outages. This demonstrates that – prior to the dispute – the parties agreed that the baseline provision did not account for outages. Thus, Philips' pre-bid decision-making relied on the interpretation that WMATA now espouses, undercutting Philips' insistence that the provision is ambiguous. *See HPI/GSA-2C v Perry*, 364 F.3d 1327, 1334-34 (Fed. Cir. 2004) (holding that contractor must rely on the interpretation it now espouses in order to apply *contra proferentum*).

Finally, to the extent that the baseline measurement clause is in any way ambiguous, we do not believe the ambiguity is patent. A patent ambiguity is limited to one that is "obvious, gross, or glaring" or is facially inconsistent. An ambiguity in a government contract is "patent" when the contract contains facially inconsistent provisions that would place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties; such an ambiguity is obvious, gross, or glaring. *NVT Techs., Inc. v. United States*, 370 F3d 1153, 1162 (Fed. Cir. 2004).

Because we have concluded that the baseline clause is not ambiguous, there is no basis to accept Philips' contention that the measured baseline should be adjusted. Indeed, the fact that Philips adopted the measured baseline of 19,186,521 kWh in its first six-month invoice is contemporaneous evidence that Philips did not consider the baseline provision to be ambiguous (finding 46). *Watts Constructors, LLP*, 20-1 BCA ¶ 37,563 at 182,386 (holding that "contemporaneous interpretation of a contract prior to a dispute is entitled to some consideration."); *see also Aegis Def. Services, LLC*, ASBCA Nos. 59082, et al., 17-1 BCA ¶ 36,915 at 179,856 (citing *Blinderman Constr. Co. v. United States*, 695 F.2d 552, 558 (Fed. Cir. 1982) (contemporaneous construction of an agreement prior to dispute is entitled to great weight)).

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

Our conclusion also makes it unnecessary to consider WMATA's challenges to the reliability of Philips' observation of fixture outages (resp't br. at 15). Likewise, we do not need to consider the proposal of Philips' expert, Linda Hsiao, to adjust the baseline only for outages recorded on the site drawings (tr. 7:39-40).

## 2. What is the Correct Start of the Maintenance Phase?

Philips contends that the construction phase was substantially complete as of August 31, 2016 (app. br. at 6). In response, WMATA contends that Philips has never achieved "final completion" as defined in the contract, because it has never met the "guaranteed energy savings." (Resp't br. at 14). According to WMATA, there is no provision in the contract that identifies "substantial completion" as a trigger for any payment obligations. WMATA claims that it was not until May 2017 before Philips satisfied all of the criteria for "final completion" except for meeting the guaranteed energy savings (resp't br. at 14-15). However, in a footnote to its brief, WMATA purports to make a "good faith concession" that it allowed the maintenance phase and invoicing to begin as of February 1, 2017, despite ongoing installation work (resp't br. at 15, n.10).

In support of the earlier start date for the maintenance phase, Philips relies upon testimonial evidence from Gregory Jones, who stated that, as of August 2016, the only tasks remaining were "punch list items," such as installing some exit signs and difficult-to-reach stairway lights (tr. 2/160-61). Philips also cites to documentary evidence, including meeting minutes from an August 2016 meeting with WMATA discussing the transition from the construction phase (R4, tab 408), as well as its own correspondence stating that, as of August 31, 2016, only 1 percent of the fixtures remained to be installed (R4, tab 435 at 1).

As WMATA has reluctantly conceded, the February 1, 2017 date is consistent with the parties' contemporaneous conduct. WMATA's contracting officer at the time, Kunj Behari, agreed to allow payments to begin as of February 1, 2017 (tr. 4/82-83). Likewise, Philips' August 2017 invoice used the February 1, 2017 date as the completion date for construction (finding 46).

Therefore, we conclude that the maintenance phase began on February 1, 2017.

## 3. What Utility Rates Should Be Used to Calculate Energy Savings?

WMATA contends that, in the event of an energy savings shortfall in any period, the amended payment owed to Philips is calculated using WMATA's actual utility rates for the period. The contract states that the amended payment is calculated by:

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

multiplying the difference between the measured actual
energy consumption and the baseline energy consumption
by the price per Kwh paid WMATA [sic] during the
period.

R4, tab 1 at 109. According to WMATA, Philips must calculate the "price per Kwh paid [by] WMATA" using WMATA's actual utility rates during the period (resp't reply at 19-20). We disagree.

First, we previously held that the parties relied on an agreed-upon imputed utility rate to calculate the "estimated energy cost to WMATA" in Table 1A of the contract and that WMATA's payment obligations depend upon an agreed imputed utility rate. *Philips Lighting North American Corp.*, ASBCA No. 61769 *et al.*, 21-1 BCA ¶ 37,821 at 163, 649-50. Our decision is the law of the case and is binding on this issue. WMATA's arguments do not demonstrate that the Board's previous ruling was "clearly erroneous" or would cause a "manifest injustice." *Teledyne Cont'l Motors, Gen. Prods. Div.*, ASBCA No. 48364, 96-2 BCA ¶ 28,523 at 142,442 (previous decisions in the appeal are law of the case and will be overturned only if they are "clearly erroneous and would work a manifest injustice") (citations omitted).

WMATA admits that it does not know what its actual utility rates are for its garage lights, because its utility bills include multiple charges and rates and do not isolate the rate charged for garage lighting (app. reply br. at 12; ex. A-522 at 13). Indeed, in response to Philips' interrogatories, WMATA claimed that it would be "unduly burdensome" to calculate the cost of lighting at each of the 25 garages, because the garages are subject to six different utility rates which change annually, and because its utility bills aggregate electrical usage and charges for multiple garages (app. reply br. at 12-13). Although WMATA eventually produced information pertaining to its actual utility rates, Philips did not use the information in calculating its damages. WMATA pounces on this omission and contends that Philips failed to carry its burden of proving damages (resp't br. at 44-45). WMATA's position on this point is disingenuous, given its reluctance to produce the information in the first place and its admission that its own utility bills aggregate electrical usage and charges for multiple garages.

Reading the contract as a whole, it is reasonable to conclude that the imputed utility rates for each annual period in Years 1-10 embedded in Table 1 are what are referenced in the payment provision statement "the price per Kwh paid WMATA [sic] *during the period*" (R4, tab 1 at 109 (emphasis added)). *Philips Lighting North American Corp.*, ASBCA No. 61769 *et al.*, 21-1 BCA ¶ 37,821 at 163,649-50.

Finally, as Philips observes in its post-hearing brief, the contract contains no indication that Philips would be responsible for underwriting the risk of guaranteeing

24

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

WMATA's actual utility rates over the 10-year repayment period (app. br. at 43). The difficulty of predicting WMATA's future utility rates is precisely why the parties agreed to imputed rates and a 2 percent inflation escalator for Years 1-10 in Table 1. Indeed, as we previously held, Table 1 of the contract contains all the information necessary to calculate the amount of an amended installment payment. *Philips Lighting North American Corp.*, ASBCA No. 61769 *et al.*, 21-1 BCA ¶ 37,821 at 163,650.

## B. Whether Philips' Invoices Were Properly Submitted Under the Contract

WMATA contends that the contract places the obligation on Philips to submit a proper invoice. According to WMATA, the contract permits, but does not require, partial payments only after submission of a properly executed invoice accepted by WMATA's contracting officer. (Resp't br. at 17-20, 39-40)

In its post-trial briefing, WMATA makes two arguments supporting its decision to reject Philips' invoices. First, WMATA contends that Philips' invoices were not properly submitted, because Philips has not met the "guaranteed savings" level (resp't reply. br. at 14). According to WMATA's interpretation, the lighting system is not, and has never been, finally complete because Philips has not met the guaranteed energy savings level (resp't reply at 16-17). WMATA takes this a step further, contending that it has never incurred a payment obligation, because Philips has never reached "final completion." (Resp't reply at 17)

We previously rejected this argument in our July 30, 2020 opinion and, again, in our decision denying WMATA's motion for reconsideration, and do so again here, though without wasting our time by explaining it a third time. *Philips Lighting North American Corp.*, ASBCA No. 61769, *et al.*, 20-1 BCA ¶ 37,679 at 182,925-29; *Philips Lighting North American Corp.*, ASBCA No. 61769, *et al.*, 21-1 BCA ¶ 37,821 at 183,647. Our holding is the law of the case. *Teledyne Cont'l Motors, Gen. Prods. Div.*, ASBCA No. 48364, 96-2 ¶ 28,523 at 142,442-43.

WMATA's second argument is that it was justified in rejecting Philips' invoices because the invoices were contractually flawed. The invoices used the wrong baseline, wrong dates, wrong utility rates, and some sought extra payments for which Philips was not entitled. (Resp't br. at 17-20) According to WMATA, each of the invoices submitted by Philips since May 2018 are not payable because they used a unilaterally altered baseline and unsupported installation completion date (which were not agreed to or authorized by the WMATA contracting officer) and would require WMATA to recalculate the invoice amount using the contractual measured baseline and actual completion date for installation (resp't br. at 39).

25

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

In Philips' view, WMATA cannot justify years of non-payment on the grounds that Philips has never submitted a "proper invoice" (app. reply br. at 6). According to Philips, WMATA should have made partial payments based upon an alternative calculation of energy savings (app. br. at 34).

We specifically addressed the issue of partial payment in our opinion on WMATA's motion for reconsideration. Following the Board's July 30, 2020 decision finding entitlement, Philips sent letters to WMATA in August 2020 requesting interim payment for the undisputed value of the energy savings that WMATA admitted in its interrogatory answers and in other internal documents that Philips' lighting system has conferred (which were no less than 14.2 million kWh/year in energy savings, even when measured against WMATA's artificially depressed baseline) (app. br. at 34). Such interim payments would have been without prejudice to the parties' continuing disputes pending the Board's final resolution. WMATA refused Philips' requests for payment, contending that payment (if any) should await the Board's decision on quantum. *Philips Lighting North American Corp.*, ASBCA No. 61769 *et al.*, 21-1 BCA ¶ 37,821 at 183,652.

In our opinion on WMATA's motion for reconsideration, we concluded that it would be inappropriate to rule upon Philips' request for immediate payment of some amount of damages in the context of a motion for reconsideration. *Philips Lighting North American Corp.*, ASBCA No. 61769, *et al.*, 21-1 BCA ¶ 37,821 at 183,651-52. We were not in position to evaluate Philips' request for payment, because it was based upon testimonial evidence, purported admissions in pleadings, and data provided by a third party. Thus, we found no present obligation for WMATA to make interim payments to Philips prior to the Board's ruling on quantum. *Philips Lighting North American Corp.*, ASBCA No. 61769 *et al.*, 21-1 BCA ¶ 37,821 at 183,652.

However, WMATA cannot rely upon alleged deficiencies in Philips' invoices as an excuse to avoid any payment obligations whatsoever. WMATA's argument that it has no payment obligation because Philips' invoices are deficient is a red herring. WMATA's payment obligations stem from its contractual obligations, not the format or content of Philips' invoices.

Indeed, WMATA acknowledges that the lighting contract permits (but does not require) partial payments, but only after submission of a properly executed invoice accepted by the WMATA Contracting Officer's Technical Representative (resp't br. at 39). If WMATA believed that the invoices were flawed, it could have asked Philips to resubmit its invoices under terms agreeable to it or could have offered to make partial payment based upon the measured baseline. WMATA could have made such payments while preserving its arguments before the Board (app. br. at 34-35). The purported flaws in Philips' invoices could easily have been corrected with discussions between the parties and Philips could have amended its claims to reflect any payments

26

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

made by WMATA. These discussions could have occurred at any time – even after the Board's decision on entitlement. Indeed, WMATA's contracting officer retains jurisdiction to resolve disputes, even after an appeal is filed with the Board. *See J.H. Strain & Sons, Inc.*, ASBCA No. 34432, 88-3 BCA ¶ 20,909; *J.W. Bateson Co.*, ASBCA No. 24425, 84-1 BCA ¶ 16,942; Ralph C. Nash & John Cibinic, Settlement of Claims: Who Is Authorized To Do What?, 6 Nash & Cibinic Rep. ¶ 52 (Sept. 1992).

## II. Whether WMATA Acted in Bad Faith or Violated the Implied Duty of Good Faith and Fair Dealing

While recognizing the legal distinction between a finding of bad faith and a finding of a breach of the duty of good faith and fair dealing, Philips argues that the record demonstrates both. Philips contends that there is clear and convincing evidence of WMATA's bad faith and a preponderance of evidence that WMATA breached its duty of good faith and fair dealing (app. br. at 12-21). According to Philips, either finding justifies a remedy excusing Philips from further performance together with payment of the full economic expectation of the lighting contract (app. br. at 20).

WMATA contends that it did not act in bad faith, nor did it breach the duty of good faith and fair dealing. To the contrary, WMATA asserts that it went above and beyond its contractual obligations to seek a solution on payment and to assist Philips with the installation (resp't br. at 24).

### A. The Legal Standards Differ for Finding of Bad Faith as Opposed to a Violation of the Implied Duty of Good Faith and Fair Dealing

Count III of Philips' Second Amended Complaint alleges a breach of the duty of good faith and fair dealing (compl. ¶¶ 341-54). Specifically, Philips contends that WMATA delayed the construction phase of the contract by, *inter alia*, delaying site inspection and acceptance, failing to appoint a contracting officer, issuing an unsupported cure notice, and inducing Philips to prepare a remedial proposal that it had no intention of addressing on the merits (compl. ¶ 344).

Both parties agree regarding the differing legal standards for proving bad faith and a breach of the duty of good faith and fair dealing (app. br. at 12; resp't br. at 33-36). With respect to the duty of good faith and fair dealing, breach requires interference with performance or failure to cooperate that deprives the other party of the benefits for which the party bargained. *See Metcalf Constr. Co. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014) ("an act will not be found to violate the duty (which is implicit in the contract) if such a finding would be at odds with the terms of the original bargain, whether by altering the contract's discernible allocation of risks and benefits or by conflicting with a contract provision.")

27

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

Bad faith, in contrast, requires clear and convincing evidence of some specific intent to harm the contractor. *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239-40 (Fed. Cir. 2002).

In addition, the remedies differ for bad faith and breach of the duty of good faith and fair dealing. Damages for a breach of the duty of good faith and fair dealing are the same as a breach of the express terms of a government contract: payment for work performed, in accordance with the contract's terms. *See Catherine Kurkjian*, ASBCA No. 61154, 20-1 BCA ¶ 37,594 at 182,538. On the other hand, if a contractor meets the heavy burden of proving bad faith, damages such as anticipatory profits on work not performed may be available. *Apex Intern. Mgmt. Servs., Inc.*, ASBCA No. 42747 et al., 94-2 BCA ¶ 26,842 (Mar. 4, 1994) (finding that Government acted in in bad faith and that appellant consequently was entitled to receive traditional breach of contract damages, including anticipatory profits).

Philips contends that WMATA's breaches entitle Philips to (1) be excused from further performance and compensation "at no less than the full value of the contract"; (2) payment of Philips' attorney costs for responding to settlement discussions; and (3) payment of Philips' attorney costs for responding to the Cure Notice (compl. ¶¶ 352-54; app. br. at 20-21).

We address below whether WMATA's conduct amounted to either bad faith or a breach of the duty of good faith and fair dealing.

## B. WMATA's Refusal to Make Amended Installment Payments to Philips Was Not Bad Faith

Philips contends that WMATA should have made amended installment payments to Philips, even if it believed that less than full installment payments were due. Philips contends that WMATA's refusal to pay anything is evidence of bad faith. (app. br. at 35)

We agree that WMATA should have found a way to make partial payments on Philips' invoices, even given the disagreement between the parties regarding the contractual payment obligations. This failure was particularly acute following the Board's decision on entitlement, in which the Board concluded that Philips was entitled to amended installment payments. *Philips Lighting North American Corp.*, ASBCA No. 61769 *et al.*, 20-1 BCA ¶ 37,679 at 182,926-27. Indeed, WMATA could have negotiated a way to make payments subject to a reservation of rights, while acknowledging the lack of agreement over the proper baseline and other matters.

Despite this failure, we do not believe WMATA's failure to pay constitutes bad faith. To constitute bad faith, there needs to be clear and convincing evidence of a

28

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

specific intent to harm the contractor. *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239-40 (Fed. Cir. 2002). Here, there is clear disagreement between the parties over the payment terms. Mere disagreement is not bad faith. *S.A.F.E. Export Corp.*, ASBCA No. 29333, 85-3 BCA ¶ 18,404, at 92,320 ("[S]imply because a Government official does not agree . . . does not mean that the disagreement is motivated by any bad faith or as a result of improper conduct.") Despite WMATA's dogmatic insistence that it has no obligation to pay, we find no evidence of a specific intent to harm Philips.

Moreover, the evidence demonstrates that the contracting officer was acting on her good-faith interpretation of the contract's payment terms and that there was a reasonable, albeit flawed, contract-related basis for her decision to decline payment (tr. 5/38). There is no evidence that the CO exceeded her discretion or violated any applicable statutes or regulations. *Goodloe Marine, Inc.*, ASBCA Nos. 62106, 62446, 22-1 BCA ¶ 38,053 at 184,777 (citing *Third Coast Fresh Distribution, L.L.C.*, ASBCA No. 59696, 16-1 BCA ¶ 36,340 at 177,194) (finding no bad faith where the CO had a reasonable contract basis for their decision).

Therefore, we conclude that WMATA was not acting in bad faith when it refused to pay Philips' invoices.

### C. Whether WMATA's Conduct Violated the Implied Duty of Good Faith and Fair Dealing

Philips cites to several specific examples of conduct that it claims violated the implied duty of good faith and fair dealing. For example, during the installation phase, Philips claims that WMATA fell short of providing the full eight hours of electrician escort services for which Philips paid (app. br. at 5).

The primary purpose of the electrician escorts was to ensure the safety of Philips' electrical subcontractors when working on the garage lighting systems. Pursuant to the contract, WMATA was obligated to make its escorts available for "a maximum of 8 consecutive [hours] at each work location." (Finding 43) There is no evidence that WMATA failed to meet this obligation. Instead, the record demonstrates that WMATA dedicated five full-time escorts to the project (finding 54). Mr. Charles Secrist, a Shift Supervisor with WMATA during the entirety of the lighting installation from 2014 until 2017, testified that his team provided safe electrical access to WMATA's electrical systems and that supervision was necessary to prevent the contract electricians from accidentally turning off power or harming themselves. He further explained that the escort crews were union personnel and required to follow certain protocols about reporting to work. Moreover, at Philips' request, Mr. Secrist often would arrive before his escort crews to unlock secure areas in order to arrive before the contractors. (Finding 8; tr. 7/133-35)

29

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

In terms of delays that occurred during the installation phase, the record demonstrates that Philips did not fully staff the contract during the installation phase. Instead of having two full crews of 12 working at two different garages simultaneously, Philips worked at only one garage at a time during much of the installation period. The record also demonstrates that there were delays associated with the need to replace Philips' original subcontractor for the metering installation, as well as delays in obtaining the metering equipment. (Finding 44) In sum, we find substantial evidence that WMATA willingly cooperated with Philips and its subcontractors during the installation phase of the contract.

Once the lighting system was installed, Philips contends that WMATA deliberately prevented it from tuning the system controls to realize additional energy savings (app. br. at 15). According to William McShane, Director of Public Sector Services, the real energy savings come from controls and the failure to tune the system is "like [driving] a Ferrari without gasoline" (tr. 1/81). While there was some testimony that WMATA prevented Philips from tweaking the controls to maximize the savings, we do not find that this constituted a breach of the duty of good faith and fair dealing. Instead, it is more indicative of poor communication between the parties as well as the failure to spell out in the contract which party had the right to alter the lighting controls. Moreover, to the extent that adjusting the lighting system would reduce lighting levels below the illumination standards set forth in the contract, it is reasonable for WMATA to require the lighting to remain at a level that ensures customer safety (R4, tab 1 at 120; tr. 5/110-11; 5/219-21).

Finally, Philips contends that WMATA violated its duty of good faith and fair dealing when the contracting officer (CO), T. Suzette Moore, issued a default notice pursuant to default provision of the contract (finding 5; R4, tab 479). According to Philips, WMATA had no intention of actually terminating the contract and issued the "baseless" default notice as cynical attempt to coerce Philips into capitulating in settlement negotiations (app. br. at 7, 16).

WMATA's issuance of a default notice – even in the circumstances where communications between the parties had broken down – is not evidence of bad faith or a breach of the duty of good faith and fair dealing. Consistent with the presumption that government contracting officials act in good faith, we cannot infer that WMATA's contracting officer issued the cure notice solely for the purpose of threatening Philips. Based on her testimony, it is more reasonable to infer that Ms. Moore had multiple reasons for issuing the cure notice, including hoping that it would encourage Philips to submit a corrective action plan (*see* tr. 5/69). Indeed, she freely acknowledged that she intended the default notice to be a "tool" to "put the project back on track" (tr. 5/69, 94). She further admitted that WMATA was satisfied with Philips' performance and that WMATA wanted Philips to continue on the contract (tr. 5/94). Of course, Ms. Moore issued the default notice with full knowledge

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

that if Philips failed to cure the deficiency, then WMATA could terminate the contract for default (tr. 5/71).

Philips next contends that an internal WMATA spreadsheet turned over during discovery (the "scenario analysis" spreadsheet) was an admission by WMATA of its obligations under the contract and that WMATA acted in bad faith when it ignored those obligations by refusing to pay Philips' invoices (ex. A-450; app. br. at 7). WMATA asserts that the spreadsheet merely reflected a potential compromise position that WMATA was considering in the context of settlement negotiations and objected to its introduction as evidence (resp't reply at 12; tr. 5/209-10). While we ruled the document admissible during the hearing (tr. 5/209), the substance of spreadsheet does not help Philips.

In our view, WMATA created the "scenario analysis" spreadsheet for internal deliberation, but that, alone, does not make it privileged. It likely served multiple purposes, such as informing WMATA management about WMATA's potential liability for payments under the contract, as well as illustrating potential outcomes of the ongoing settlement negotiations (ex. A-450). The spreadsheet does not constitute an admission that WMATA considered itself obliged to pay Philips any particular amount, nor does it demonstrate that WMATA willfully ignored its payment obligations. Instead, it merely quantifies WMATA's potential liability should the Board determine that WMATA is obligated to make payments under the contract. Therefore, we do not view the spreadsheet as demonstrating bad faith.

Our conclusion that WMATA did not act in bad faith or breach the duty of good faith and fair dealing does not preclude us from awarding the full measure of damages based upon WMATA's material breach of the contract.

## III. Philips Is Entitled to Damages Based Upon WMATA's Material Breach of Contract

### A. Whether the Board Possesses Jurisdiction to Order WMATA to Terminate the Lighting Contract for Convenience

In the absence of a finding of either bad faith or a breach of the duty of good faith and fair dealing, Philips contends that WMATA's conduct amounts to a *de facto* default termination and, therefore, gives the Board jurisdiction to terminate the contract for convenience (app. br. at 22). Philips points to three examples of WMATA's actions to justify its position: (1) the CO's issuance of a termination for default notice in March 2018; (2) WMATA's failure to make any payment to Philips; and (3) the CO's testimony that Philips continues to be in default of the contract. Together, Philips contends that these actions constitute a material breach of the

31

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

contract and give the Board jurisdiction to convert the *de facto* default termination into a termination for convenience. (App. br. at 23)

WMATA contends that the Board does not possess jurisdiction to excuse Philips from further performance, which WMATA insists would require the Board to order the government to terminate the lighting contract for convenience (resp't br. at 36-37) (citing *Shavers-Whittle Constr., LLC*, ASBCA No. 60025, 16-1 BCA ¶ 36,246; *see also CDM Constructors, Inc.*, ASBCA No. 59524, 15-1 BCA ¶ 36,097 (dismissing appellants' request to declare that "further performance is excused" as a request for injunctive relief that the Board did "not possess jurisdiction to entertain")). WMATA also asserts that Philips' *de facto* default termination theory was not pled in its complaint and is not supported by *Malone* (resp't reply br. at 27; appendix A at 4).

WMATA is correct regarding the Board's jurisdiction to order injunctive relief, but Philips is not seeking an injunctive remedy *per se*. Instead, Philips contends that WMATA's conduct amounts to a *de facto* default termination and that the Board routinely converts default terminations into terminations for convenience. Moreover, Philips asserts that its expectation damages under the lighting contract area essentially the same as what it would be entitled to under a termination for convenience (app. br. at 23).

WMATA contends that there is no authority for the Board to direct an agency to issue a termination for convenience or similar injunctive-type relief under contracts subject to the Contract Disputes Act. According to WMATA, excusing Philips from performance is an "extraordinary remedy" and would require the Board to order a termination for convenience (resp't br. at 36-37).

WMATA misses the point. Because WMATA has committed a material breach of the lighting contract by failing to pay Phillips, there is no need for us to order injunctive relief to award Philips the damages it seeks. Indeed, we need not conclude that WMATA's actions constitute a *de facto* default termination, nor do we need to order WMATA to terminate the contract for convenience. Instead, because WMATA's non-payment constitutes a material breach of the lighting contract, Philips is entitled to cease performance and obtain the full measure of damages that would place it in the same position it would be but-for the breach. *Stone Forest Indus. Inc. v. United States*, 973 F.2d 1548, 1550 (Fed. Cir. 1992) ("Upon material breach of a contract the non-breaching party has the right to discontinue performance of the contract . . .").

As we previously held, the contract imposes an obligation on WMATA to (1) respond to invoices within 30 days and (2) pay for the value of energy savings conferred—including an obligation to make an amended installment payment in the event of an energy savings dispute or shortfall. *Philips Lighting North American*

32

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

*Corp.*, ASBCA No. 61769 *et al.*, 20-1 BCA ¶ 37,679 at 182, 926-28; *Philips Lighting North American Corp.*, ASBCA No. 61769 *et al.*, 21-1 BCA ¶ 37,821 at 183, 649-50. As WMATA has admitted, WMATA has not paid Philips any amount under the lighting contract (finding 52).

### B. WMATA's Material Breach Gives Philips The Right to Abandon Performance

We hold that, in the circumstances here, with no attempt made to make even a partial payment over a period of years, despite the Board's previous finding that the contract obligated WMATA to make payments to Phillips, WMATA's actions and inactions constituted a material breach of the lighting contract. *See Consumers Oil Co.*, ASBCA No. 24172, 86-1 ¶ 18,647 at 97,713 (holding that, though such tests were necessarily imprecise, in circumstances in which late or non-payment constituted a substantial impairment of the value of the contract or deprived the contracting party of an expected contractual benefit, the government's continued failure to make timely payments was a material breach of contract); *see also Nexus Constr. Co.*, ASBCA No. 31070, 92-2 BCA ¶ 24,923 at 124,267 (holding that government's wrongful withholding of progress payments equivalent to 22 percent of the contract was a material breach).[3]

When confronted with a material breach, the non-breaching party must make a choice. "When one party commits a material breach of contract, the other party has a choice between two inconsistent rights – [it] can either elect to allege a total breach, terminate the contract and bring an action, or, instead, elect to keep the contract in force, declare the default only a partial breach, and recover those damages caused by that partial breach . . . ." *Scott Timber Co. v. United States*, 692 F.3d 1365, 1378 (Fed. Cir. 2012) (quoting Richard A. Lord, *Williston on Contracts* § 39:32 (4th ed.)).

However, if the non-breaching party permits the other party to continue to perform after the breach, the non-breaching party is precluded from rescinding or declaring a material breach. *Scott Timber*, 692 F.3d at 1378-79 (quoting *Williston on Contracts* § 40:1 (4th ed.)). Indeed, the nonbreaching party, by electing to continue receiving benefits under the agreement, cannot then refuse to perform its part of the bargain. *See Williston on Contracts* § 39:32 (4th ed.).

Because Philips continues to maintain the lighting system pursuant to the contract and has not elected to cease performance, we award damages based on Philips past performance through February 29, 2024. If Philips continues performance going

---

[3] To be clear, not every late payment of money or progress payments on a contract constitutes a material breach: as discussed in *Consumers Oil Co.*, it all depends on the circumstances. *See* 86-1 ¶ 18,647 at 97,713

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

forward, WMATA must pay any future invoices pursuant to the terms of the contract and this decision. Although Philips has continued to perform its maintenance duties pursuant to the lighting contract, Philips has stated in its complaint, at the hearing, and in its briefs that it intends to abandon performance and seek the full measure of contract damages placing it in the same position it would have been but for the breach. If and when Philips does abandon its performance, WMATA will be subject to such damages, but that is not the case yet. In any event, Philips contends that WMATA's breaches entitle Philips to (1) be excused from further performance and compensation "at no less than the full value of the contract"; (2) payment of Philips' attorney costs for responding to settlement discussions; and (3) payment of Philips' attorney costs for responding to the Cure Notice (compl. ¶¶ 352-54; app. br. at 20-21).

As more fully explained below, we hold that Philips is not entitled to recover its attorney costs for responding to settlement discussions or the cure notice.

## IV. Calculation of Quantum for WMATA's Breach

Our factual determinations of the disputed questions concerning the applicable energy consumption baseline and the maintenance start date guide our choice of damages scenarios. Our damages award generally follows the third alternative scenario proposed by Philips' expert witness, Ms. Linda Y. Hsiao. That scenario relies upon the measured baseline of 19,186,521 kWh and a maintenance period start date of February 1, 2017. (App. ex. 533 at 28; schedule 4). It includes payment of the stipulated amount of $597,732 to account for the energy savings accumulated during the 730-day installation period (*see* app. br. at 35).

Philips has proved its damages with reasonable certainty. *Shell Oil Co. v. United States*, 896 F.3d 1299, 1312 (Fed. Cir. 2018); *Sw. Marine, Inc.*, ASBCA No. 54550, 11-2 BCA ¶ 34,871 at 171,525.

### 1. Lost Revenues from Past Maintenance Periods

Pursuant to the Board's orders dated July 21, 2023 and February 14, 2024, Philips supplemented its claims to include invoices through the end of August 2023, and again through February 29, 2024, and updated its calculation of the net present value accordingly. Specifically, Philips updated its figures for March 2020 through January 31, 2024, to reflect the actual energy consumption and savings as stated on Philips' semi-annual invoices and savings reports to WMATA. (*See* March 22, 2024 joint status report, ex. B at 10) Based upon these updated calculations, we award Philips its lost revenue from the past maintenance periods in the amount of **$10,654,218**.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

## 2. Lost Revenues from Future Maintenance Periods

The second component of Philips' claimed damages is lost revenue from future maintenance periods as adjusted for avoided maintenance costs. This component is based upon Philips being excused from further performance under the contract and is intended to make Philips whole for the future revenue it would have earned under the contract and to compensate it for the cost associated with providing and installing the lighting system. Because Philips has elected to continue performance, we do not offer an opinion on Philips' claimed damages from lost revenue from future maintenance periods. Instead, as long as Philips continues to perform, Philips should submit invoices to WMATA pursuant to the terms of the contract, based upon the measured baseline of 19,186,521 kWh, at the conclusion of each remaining six-month period.

## V. Whether Philips is Entitled to Additional Damages

Philips contends that it is entitled to three categories of additional damages, including: (1) additional damages under Part II, Section 2 ¶ 43 of the lighting contract for $88,333 in infrastructure repairs; (2) $1,314,167 for the installation and continued metering expenses associated with 74 additional power meters that were installed in order to fully monitor electricity usage in the garages; and (3) the value of additional energy savings benefits that WMATA accrued during the extended construction phase (which amount depends upon our resolution of both the energy consumption baseline and the maintenance phase start date). (App. br. at 35-36) We address each element of damages below.

### A. Reimbursement for Infrastructure Repair

Philips claims damages of $88,333 under Part II, Section 2 ¶ 43 of the contract for in infrastructure repairs. Philips' subcontractors, Lamb and LMI, performed these repairs and documented them in change orders submitted to WMATA. (Ex A-533 at schedule 5)

WMATA contends that Philips is not entitled to be paid for these infrastructure repairs, because the CO did not properly approve or ratify the expenditures. WMATA asserts that it did not authorize the work and that Philips never invoiced WMATA for it (resp't reply at 21). WMATA further contends that Philips failed to follow the requirements of the lighting contract's Repair of Existing Defective Electrical Distribution System provision (R4, tab 1 at 108). Specifically, WMATA complains that Philips (or its subcontractors) never expressly sought permission from WMATA to perform the work and that Philips never submitted invoices for the work outside of these appeals (resp't reply at 21-22).

35

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

WMATA fails to demonstrate that it was harmed by Philips' alleged failure to follow the correct procedures. There is no dispute that the infrastructure repairs were necessary, or that WMATA had an obligation to pay for the repairs. Paragraph 43 of the lighting contract sets forth a procedure for identifying needed repairs and WMATA does not dispute that Philips identified many necessary repairs during the construction phase. WMATA cannot dispute that its representatives all acknowledged that WMATA was obligated to pay for necessary infrastructure repairs. Both the current CO, Suzette Moore, and former CO, Kunj Behari, confirmed that WMATA has the obligation to pay for any repairs performed by the contractor (tr. 4/70; 5/78-9; 6/89). Phillip Rogers, WMATA's Director of Parking, also confirmed that the contract required WMATA to reimburse Philips for any repairs it directed Philips to make to the garage infrastructure (6/89).

In addition, paragraph 43 of the contract says nothing about the submission of invoices and does not set forth any specific process for directing and authorizing the repairs, other than identifying the needed repairs in the initial design submittal. Other than arguing that Philips failed to follow the requirements of paragraph 43, WMATA does not specifically challenge any of the $88,333 in infrastructure repair costs claimed by Philips (resp't reply at 21-22). Therefore, we conclude that Philips is entitled to recover the costs of these repairs. *See Goodloe Marine, Inc.*, ASBCA No. 61960, 23-1 BCA ¶ 38,387 at 186,520-21 (strict adherence to notice requirement of suspension of work and other contractual clauses unnecessary when it would serve no useful purpose).

The fact that Philips' subcontractors itemized and documenting the repairs in a series of change orders is sufficient to prove quantum. Therefore, we conclude that Philips is entitled to infrastructure repair costs in the full amount of **$88,333**.

## B. Extra Meters and Metering Costs

Philips seeks $1,314,167 for the installation and continued metering expenses associated with 74 additional power meters that Philips alleges it had no way of knowing would be required at the outset of the project (app. br. at 35). According to Philips, WMATA prevented it from conducting any engineering audit or review of the electrical panels prior to bidding on the project (app. br. at 37). Moreover, WMATA did not provide (or have) panel or circuit drawings of the existing lighting system in the garages (*id.*). Philips argues that the need to install these additional meters was a cardinal change to the contract (app. br. at 39).

WMATA opposes Philips' entitlement to any extra costs associated with the installation of additional meters beyond Philips' estimated number (resp't br. at 22). According to WMATA, the contract was performance based, in that it required Philips to determine the number of meters required to measure the energy usage of the lighting

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

system and placed the risk on the contractor to use its expertise to design and implement a solution (tr. 5/189). Finally, WMATA contends that there is no evidence that the CO ever authorized or ratified any extracontractual work (resp't br. at 23).

In our view, the contract's requirements for the measurement of the lighting system's energy usage (both before and after the installation of the new fixtures) are performance specifications, rather than design specifications. As a consequence, the contract places the burden on the contractor to determine the means and methods necessary to accomplish the objective of measuring the actual energy consumption of the lighting system.

The difference between performance specifications and design specifications is well established. *D&J Machinery, Inc.*, ASBCA No. 62019, 22-1 BCA ¶ 38,118 at 185,16465. Performance specifications "set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection." *J.L. Simmons Co. v. United States*, 188 Ct. Cl. 684, 689 (1969). Design specifications, in contrast, describe in precise detail the materials to be employed and the manner in which the work is to be performed. The contractor has no discretion to deviate from the specifications but is "required to follow them as one would a road map." *Id*.

The contract expressly required Philips to determine the number of meters required the measure the energy usage of the lighting system and to submit a plan for installing the meters (R4, tab 1 at 108). The baseline provision stated:

> Baseline energy consumptions shall be established by directly measuring the power consumption for the current lighting system at each garage for a minimum period of six weeks before installation of the new lighting system. The measurement shall be accomplished by installing utility grade meters on all electrical circuits/panels not currently connected to dedicated meters. The contractor shall submit a plan for installing the meters within 45 days of notice to proceed.

(R4, tab 1 at 108) Similarly, section 7.0 of the contract, pertaining to the measurement of the lighting system after the new fixtures are installed, required Philips to "isolate the lighting loads and provide actual voltage, current, and energy consumption for the entire lighting system (not mathematically)" (R4, tab 1 at 120).

> The monitoring system shall have the ability to view and access real-time lighting and total garage energy

37

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

> consumption for each garage using utility grade meters.
> The necessary number of meters shall be placed on
> electrical gear at each garage to isolate the lighting loads
> and provide actual voltage, current and energy
> consumption for the entire lighting system (not
> mathematically). Meter shall remain in place for the entire
> contract period. Energy consumption information shall be
> available for peak demand and overall energy usage.

(R4, tab 1 at 120) Critically, neither of these provisions dictate the number, brand, or specific type of meters that Philips must install. Instead, it leaves it up to the contractor to make those decisions in order to meet the requirements to directly measure the lighting system's energy usage (tr. 4/159-60)

Indeed, the contract expressly places the risk upon contractor to ascertain the nature and extent of the work, stating that "[t]he Contractor shall be responsible for having taken steps reasonably necessary to ascertain the nature and extent of the work, and the general and local conditions which can affect the work or the cost thereof" (R4, tab 1 at 87). Moreover, Philips had an opportunity to tour and photograph the garages before bidding (finding 3).

Finally, the installation of the additional power meters was not a cardinal change, because there is no evidence that WMATA ever directed Philips to install the meters. *See Env't Safety Consultants, Inc.*, ASBCA No. 51722, 11-2 BCA ¶ 34,8448 at 171,428 (cardinal change is a unilateral modification beyond the scope of the contract).

Therefore, we conclude that Philips is not entitled to additional damages based upon the installation of additional power meters.

## C. Payment for Enhanced Construction Phase Savings Conferred as a Result of WMATA's Delays

We previously held that the correct start of the maintenance phase is February 1, 2017. This holding obviates the need to discuss whether Philips is entitled to compensation for energy savings accumulated by WMATA during the enlarged installation period from the original deadline of August 31, 2016 until February 1, 2017.

Nonetheless, there are additional reasons Phillips should not be compensated for energy savings accumulated during the enlarged installation period. First, the contract provides no basis for compensation during the installation beyond the fixed installation fee of $597,732 (R4, tab 1 at 5). Unlike the bi-annual installment

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

payments based upon energy savings during the maintenance period, the installation payment is a fixed fee and, as Philips admits, does not depend upon any demonstrated energy savings (R4, tab 1 at 5; tr. 4/106; app. br. at 17 n.7).

Philips has not met its burden of demonstrating that any delays in meeting the installation deadline were the fault of WMATA. Mr. Jones, Philips' project manager, admitted to concurrent delays (tr. 2/65). Although Philips requested a contract modification in November 2016 to extend the installation phase until February 2017, it is also true that this contract modification provided no additional compensation or any change to the fixed installation fee (R4, tab 14 at 293; tab 22).

Moreover, Philips has provided no evidence that any alleged WMATA delays were on the critical path. *See Contel Advanced Sys., Inc.*, ASBCA No. 49075, 04-2 BCA ¶ 32,664 at 161,680. In addition, there is unrebutted testimony from WMATA's Sustainability Director, Rachel Healy, that Philips failed to adequately staff the installation, thereby leading to delays in the lighting system installation (tr. 5/218).

Finally, the contract establishes that the risk of any delays in the installation of the lighting system fall upon Philips (R4, tab 1 at 87). Paragraph 13 of the contract provides that the contractor is responsible for ascertaining the general and local conditions affecting the work and that "any failure [to do so] will not relieve the contractor from responsibility for successfully performing work without additional expense to the [WMATA]" (Finding 29). Philips contends that the delays were neither fair nor reasonable, but otherwise fails to rebut WMATA's argument that the contract placed the risk of construction delays on Philips (app. br. at 40-41).

## CONCLUSION

For these reasons, we conclude that Philips is entitled to receive a total award in the amount of **$10,742,551**. If Philips continues performance going forward, WMATA must pay any future invoices pursuant to the terms of the contract and consistent with this decision.

Dated: November 15, 2024

KENNETH D. WOODROW
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

39

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

I concur                                    I concur


OWEN WILSON                                 J. REID PROUTY
Administrative Judge                        Administrative Judge
Acting Chairman                             Vice Chairman
Armed Services Board                        Armed Services Board
of Contract Appeals                         of Contract Appeals


      I certify that the foregoing is a true copy of the Opinion and Decision of the
Armed Services Board of Contract Appeals in ASBCA Nos. 61769, 61873, 62391,
Appeals of Philips Lighting North American Corporation, rendered in conformance
with the Board's Charter.


      Dated:  November 15, 2024


PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals